**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

IN RE: BOSTON SCIENTIFIC CORP.,
      PELVIC REPAIR SYSTEM
      PRODUCTS LIABILITY LITIGATION

                                                MDL No. 2326

-------------------------------------------------------------

THIS DOCUMENT RELATES TO THE FOLLOWING CASE:

*Sharrene Timothy & Thomas Timothy v. Boston Scientific Corp.*      No. 2:12-cv-05950

**MEMORANDUM OPINION AND ORDER
(Defendant's Motion for Summary Judgment)**

Pending before the court is the defendant's Motion for Summary Judgment Based on Statute of Limitations ("Motion") [Docket 39]. For the reasons set forth below, the Motion is **GRANTED**, and this case is **DISMISSED with prejudice**.

**I.      Background**

This case resides in one of seven MDLs assigned to me by the Judicial Panel on Multidistrict Litigation concerning the use of transvaginal surgical mesh to treat pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI"). In the seven MDLs, there are more than 70,000 cases currently pending, approximately 15,000 of which are in the Boston Scientific Corp. ("BSC") MDL, MDL 2326. In an effort to efficiently and effectively manage this massive MDL, I decided to conduct pretrial discovery and motions practice on an individualized basis so that once a case is trial-ready (that is, after the court has ruled on all *Daubert* motions, summary judgment motions, and motions *in limine*, among other things), it can then be promptly transferred or remanded to the appropriate district for trial. To this end, I ordered the plaintiffs

and defendant to each select 50 cases, which would then become part of a "wave" of cases to be prepared for trial and, if necessary, remanded. (*See* Pretrial Order # 65, *In re: Boston Scientific Corp. Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2:12-md-002326, entered Dec. 19, 2013, *available at* http://www.wvsd.uscourts.gov/MDL/boston/orders.html). This selection process was completed twice, creating two waves of 100 cases, Wave 1 and Wave 2. The Timothys' case was selected as a Wave 2 case by the plaintiffs.

On June 30, 2009, Ms. Timothy was surgically implanted with the Pinnacle Pelvic Floor Repair Kit (the "Pinnacle") and the Lynx Suprapubic Mid-Urethral Sling System (the "Lynx"). (*See* BSC's Mot. for Summ. J. & Mem. of Law in Supp. ("Mem. in Supp.") [Docket 39], at 3). The Pinnacle was manufactured by BSC to treat POP, and the Lynx was manufactured by BSC to treat SUI. (*See* Pl. Fact Sheet [Docket 39-1], at 5). Ms. Timothy received her surgery at a hospital in Layton, Utah. (Mem. in Supp. [Docket 39], at 3). She claims that as a result of implantation of the Pinnacle and the Lynx, she has experienced multiple complications, including pain, infections, urinary and bowel problems, bleeding, dyspareunia, and mesh erosion. (*Id.*). She brings the following claims against BSC: negligence; strict liability for design defect, manufacturing defect, and failure to warn; breaches of express and implied warranties; and punitive damages. (*Id.* at 2 (citing to the plaintiff's Short Form Compl.)). In the instant motion, BSC argues that each of Ms. Timothy's claims are barred by Utah's statute of limitations, and consequently, the court should grant summary judgment in favor of BSC and dismiss Ms. Timothy's case. BSC further contends that if Ms. Timothy's claims are barred as untimely, Mr. Timothy's claim for loss of consortium is also time barred and should be dismissed.

## II.      Legal Standards

### A.  Summary Judgment

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Ross v. Comm'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *abrogated on other grounds*, 490 U.S. 228 (1989).

### B.  Choice of Law

Under 28 U.S.C. § 1407, this court has authority to rule on pretrial motions in MDL

cases. The choice of law for these pretrial motions depends on whether they concern federal or state law:

> When analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located. When considering questions of state law, however, the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation.

*In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996) (internal citations omitted). To determine the applicable state law for a dispositive motion based on the statute of limitations, I generally refer to the choice-of-law rules of the jurisdiction where the plaintiff first filed her claim. *See In re Air Disaster at Ramstein Air Base, Ger.*, 81 F.3d 570, 576 (5th Cir. 1996) ("Where a transferee court presides over several diversity actions consolidated under the multidistrict rules, the choice of law rules of each jurisdiction in which the transferred actions were originally filed must be applied."); *In re Air Crash Disaster Near Chi., Ill.*, 644 F.2d 594, 610 (7th Cir. 1981); *In re Digitek Prods. Liab. Litig.*, MDL No. 2:08-md-01968, 2010 WL 2102330, at *7 (S.D. W. Va. May 25, 2010). However, if a plaintiff files her claim directly into the MDL in the Southern District of West Virginia, as Ms. Timothy did in this case, I consult the choice-of-law rules of the state in which the plaintiff was implanted with the product. *See Sanchez v. Boston Scientific Corp.*, 2:12-cv-05762, 2014 WL 202787, at *4 (S.D. W. Va. Jan. 17, 2014) ("For cases that originate elsewhere and are directly filed into the MDL, I will follow the better-reasoned authority that applies the choice-of-law rules of the originating jurisdiction, which in our case is the state in which the plaintiff was implanted with the product."). Ms. Timothy received the Pinnacle and the Lynx implantation surgery in Utah. Thus, the choice-of-law principles of Utah guide this court's choice-of-law analysis.

The parties agree, as does this court, that these principles compel application of Utah law to the plaintiffs' claims. In tort actions, Utah employs the "most significant relationship" test as

articulated by the Restatement (Second) of Conflict of Laws ("Restatement") to determine which state's laws should apply to a given circumstance. *See Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1059 (Utah 2002). Section 145 of the Restatement lists the following factors to consider when determining which state has the most significant relationship to a dispute: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement § 145(2). The Restatement directs that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.* Here, the implantation surgery that allegedly resulted in Ms. Timothy's injuries took place in Utah. (Pl. Short Form Compl. [Docket 1], at 4). The Timothys are Utah residents. (*Id.* at 1). And Ms. Timothy's subsequent medical treatment for the claimed injuries occurred in Utah. (Pl. Fact Sheet [Docket 39-1], at 7). Accordingly, Utah has the most significant relationship to the occurrence alleged in this lawsuit and to the parties. Thus, I apply Utah's substantive law—including Utah's statute of limitations—to this case.

### III.   Discussion

I begin by reviewing the relevant undisputed facts.[1] Ms. Timothy underwent implantation of the Pinnacle and the Lynx on June 30, 2009. (Pl. Fact Sheet [Docket 39-1], at 5). At least three of Ms. Timothy's medical records include the names of the implanted products, including (1) the informed consent discussion recorded by Dr. Johnson and placed in Ms. Timothy's medical records, (*see* Timothy Medical Rs. July 1, 2009 [Docket 39-3], at 16 (explaining to Ms. Timothy that in her implantation surgery, he would "probably [use] Pinnacle mesh posteriorly and

---

[1] The plaintiffs state that BSC's recitation of the facts is accurate but incomplete. Therefore, I provide the relevant facts as noted in BSC's Motion and include the additional facts described in the plaintiffs' responsive briefing.

possibly anterior[ly] along with a Lynx")); (2) Ms. Timothy's perioperative medical records, (*see* Timothy Medical Rs. June 30, 2009 [Docket 39-3], at 5 (listing the "procedure implants" as the Pinnacle Pelvic Floor Repair Kit and the Lynx Sling, both manufactured by "Boston Scientific Products")); and (3) Dr. Johnson's operative notes, (*see id.* at 3 (detailing the implant of the Pinnacle posterior graft and the Lynx)). Importantly, the perioperative medical records identify BSC as the manufacturer of the implants Ms. Timothy received. (*See id.* at 5).

Six months after the implantation surgery, Ms. Timothy began to experience "problems." (Pl. Fact Sheet [Docket 39-1], at 6). These problems included a "scratchy" and "poking" feeling in her vagina, blood in her urine, and continued incontinence. (Sharrene Timothy Dep. [Docket 39-2], at 54:13–35). The bleeding progressed, and in February or March of 2010, Ms. Timothy began to bleed from either her vagina or her rectum. (*Id.* at 159:18–161:1). Ms. Timothy went to see Dr. Johnson about these symptoms on April 19, 2010. (*Id.* at 161:4–15). Dr. Johnson noted that Ms. Timothy complained of "abnormal bleeding" with "increasing symptoms," and of "dyspareunia" with "very severe" pain that "seems to be getting worse with time." (Timothy Medical Rs. Apr. 19, 2010 [Docket 39-3], at 9). Upon examination, Dr. Johnson found that Ms. Timothy had "some erosion of her mesh" and that "she's having a [sic] significant pelvic pain." (*Id.* at 11; *see also id.* at 13 ("[Patient] has erosion of the mesh involving the left lateral aspect of the distal end of the vagina.")). He recommended that Ms. Timothy remove the eroded portion of the mesh. (*Id.*). Ms. Timothy remembers Dr. Johnson telling her that he could feel the mesh, that he believed the mesh was causing the bleeding, and that he would "repair" the mesh in his office. (Sharrene Timothy Dep. [Docket 39-2], at 162:3–25).

On May 28, 2010, Ms. Timothy saw Dr. Johnson for a preoperative visit for the "surgical repair" of her mesh due to "pelvic pain," "dyspareunia," and "[a]bnormal vaginal bleeding."

(Timothy Medical Rs. May 28, 2010 [Docket 39-3], at 6). He noted that her mesh had "eroded through on the left side." (*Id.*). On June 1, 2010, Dr. Johnson performed the excision/removal procedure on Ms. Timothy. (Pl. Fact Sheet [Docket 39-1], at 5). Dr. Johnson was "very pleased" with the repair surgery. (Timothy Medical Rs. Operative Report June 1, 2010 [Docket 73-4], at 1).

Ms. Timothy's pelvic pain eventually returned, and she again visited Dr. Johnson on November 15, 2010. (Timothy Medical Rs. Nov. 15, 2010 [Docket 73-1], at 199). Dr. Johnson thought that Ms. Timothy might have vaginitis. (*Id.*). On December 8, 2010, at Dr. Johnson's recommendation, Ms. Timothy presented to Dr. Glen Morrell for pain in her hip and groin region. (Timothy Medical Rs. Dec. 8, 2010 [Docket 73-1], at 196). Dr. Morrell stated that he was "uncertain as to the etiology" of her pain and questioned whether it "related to her back problems." (*Id.*).

Ms. Timothy hired an attorney after she "saw a commercial on TV about the mesh product that had been [in her] surgery." (Sharrene Timothy Dep. [Docket 39-2], at 22:15–17). According to her, she "attributed" her problems to the mesh at this time. (Pl. Fact Sheet [Docket 39-1], at 5). After seeing the commercial, Ms. Timothy followed up with Dr. Johnson about a possible "mesh infection." (Timothy Medical Rs. Sept. 30, 2011 [Docket 73-1], at 129). She explained to Dr. Johnson that she saw TV advertisements about the dangers of mesh and that "she did have erosion and we did have to remove part of the mesh." (*Id.*). Throughout the months of October and November 2011, Ms. Timothy continued to visit various doctors about pain with intercourse, urinary incontinence, and irritation. (*See generally* Timothy Medical Rs. [Docket 73-1], at 93–112). On July 20, 2012, Ms. Timothy visited her regular clinic with a possible bladder infection. (Timothy Medical Rs. July 20, 2012 [Docket 73-1], at 32). The record states "She's

7

worried her mesh is causing some kind of problem. Seen lots of commercials about the problems with mesh and she's wondering if she doesn't have a problem." (*Id.*). Ms. Timothy filed suit on September 26, 2012. (Pl.'s Short Form Compl. [Docket 1]).

Utah's Product Liability Act ("UPLA") provides a two-year statute of limitations for the plaintiffs' claims. Utah Code Ann. § 78B-6-706 (West 2014).[2] Section 78B-6-706 explicitly incorporates the discovery rule by providing that the action "shall be brought within two years from the time the individual who would be the claimant in the action discovered, or in the exercise of due diligence should have discovered, both the harm and its cause." *Id.* The Supreme Court of Utah has yet to elaborate on the precise contours of Utah's discovery rule, in particular, whether "cause" as mentioned in section 78B-6-706 means only "identity of the manufacturer," "cause in fact," or "possible legal responsibility." However, lower Utah courts have interpreted the phrase– "and its cause"–to mean both the identity of the allegedly defective product's manufacturer and the causal relationship between the product and the harm. *See Aragon v. Clover Club Foods Co.*, 857 P.2d 250, 252–54 (Utah Ct. App. 1993). *Aragon* holds that discovery of "cause" requires discovery of "the identity of the manufacturer" and that "due diligence" is "that diligence which is appropriate to accomplish the end sought and which is reasonably calculated to do so." *Id.* at 252–53. Following *Aragon*, courts considering Utah law have applied a three-part analysis to statute-of-limitations issues under the UPLA:

> [T]he UPLA statute of limitations begins to run when the plaintiff discovers, or should have discovered: (1) that she has been injured; (2) the identity of the maker of the allegedly defective product; and (3) that the product had a possible causal relation to her injury.

---

[2] Both Ms. Timothy's non-warranty and warranty claims fall under this general statute. *See Davidson Lumber Sales, Inc. v. Bonneville Inv., Inc.*, 794 P.2d 11, 16 (Utah 1990) (holding that the UCC four-year statute of limitations for contracts (Utah Code Ann. § 70A-2-725) does not apply to warranty claims based on personal injury).

*Hansen v. Novartis Pharms. Corp.*, No. 2:08-cv-985, 2011 WL 6100848, at *3 (D. Utah Dec. 7, 2011) (citing *Aragon*); *see also Pratt v. Cavagna N. Am., Inc.*, No. 2:13-cv-107, 2013 WL 6146075, at *3 (D. Utah Nov. 21, 2013) (same); *McDougal v. Weed*, 945 P.2d 175, 177 n.1 (Utah Ct. App. 1997) (reasserting *Aragon*'s holding that the statute of limitations is tolled until the plaintiff discovers "both the injury and the identity of the manufacturer" and distinguishing the UPLA from the statute of limitations for medical malpractice). With no direction from the Supreme Court of Utah to the contrary, I now apply this analysis to the present facts. *See Castillo v. Holder*, 776 F.3d 262, 268 n.3 (4th Cir. 2015) ("[W]hen the state's highest court has not engaged in such statutory interpretation, a state's intermediate appellate court decisions constitute the next best indicia of what state law is . . . ." (internal quotations omitted)).

The plaintiff points to *Bridgewaters v. Toro Co.* for the premise that the discovery provision of the UPLA statute of limitations would be triggered upon discovery that a "defective product" caused the injury. 819 F. Supp. 1002, 1009 (D. Utah 1993) (holding that the "cause" that must be discovered for purposes of section 78B-6-706 is "the legal cause, and not merely the 'but for' cause"). The court is aware of only one other case adopting this strict interpretation of the UPLA's discovery rule. *See Strickland v. Gen. Motors Corp.*, 852 F. Supp. 956, 959 (D. Utah 1994). I find these applications of section 78-B-6-706 unpersuasive for several reasons. First, *Bridgewaters* was a federal district court case decided several months prior to the *Aragon* decision. Thus, I must defer to *Aragon* over *Bridgewaters*. *See United States v. King*, 673 F.3d 274, 279 (4th Cir. 2012) (stating that the federal courts should "generally defer to the state's intermediate appellate courts" on an issue undecided by the highest court of the state). Second, although later in time, the *Strickland* decision arises from an overly broad understanding of *Aragon* and the *Aragon* court's reliance on the Washington Supreme Court case of *North Coast*

*Air Services v. Grumman Corp.*, 759 P.2d 405 (Wash. 1988)—while acknowledging *North Coast*'s reading of Washington's statute of limitations as requiring discovery of the "legal cause," *Aragon*'s holding as much narrower, finding that the UPLA "tolls the statute of limitations until the plaintiff discovers, or in the exercise of due diligence should have discovered, *the identity of the manufacturer*." 857 P.2d at 252–53 (emphasis added). Finally, as explained above, the majority of Utah cases addressing this matter rely on *Aragon*'s three-part analysis (or something less stringent, *see, e.g.*, *Cannon v. Minn. Min. & Mfg. Co.*, 2009 WL 350561, at *6 (D. Utah Feb. 11, 2009) (considering whether the plaintiff knew that the product "was the *possible* cause" of his symptoms) (emphasis added)), and do not require discovery of a specific product defect. For these reasons, I follow *Aragon* rather than *Bridgewaters*.

In BSC's view, the statute of limitations began to run on May 28, 2010, at Ms. Timothy's preoperative visit for the mesh removal surgery, when Dr. Johnson explained that the mesh had eroded and needed to be removed. Consequently, BSC argues that Ms. Timothy's lawsuit, filed on September 26, 2012, is barred by the UPLA statute of limitations. The plaintiff, on the other hand, contends that the statute of limitations did not start until 2011, when Ms. Timothy saw television commercials and "attributed" her "legal injuries" to the mesh. (Pl.'s Resp. & Supp. Mem. in Opp'n to BSC's Mot. for Summ. J. Based on Statute of Limitations ("Resp.") [Docket 73], at 9–10). The undisputed facts, considered under the *Aragon* test, lead this court to agree with BSC.

First, Ms. Timothy testified that she discovered her injuries in late 2009, about six months after her surgery. (*See* Pl. Fact Sheet [Docket 39-1], at 5). Second, Ms. Timothy's pre- and post-surgery medical records identify BSC as the manufacturer of the implanted products, the Pinnacle and the Lynx. (*See* Timothy Medical Rs. July 1, 2009 [Docket 39-3], at 16; Timothy

Medical Rs. June 30, 2009 [Docket 39-3], at 3, 5). Assuming that this information was not directly conveyed to Ms. Timothy by her physician, the court must then ask whether Ms. Timothy "presented evidence that would allow a reasonable jury to find that even if she had used 'diligence which is appropriate to accomplish the end sought and which is reasonably calculated to do so,' she should not have ascertained the identity of the manufacturer." *Griffiths-Rast v. Sulzer Spine Tech*, 216 F. App'x 790, 796–97 (10th Cir. 2007) (quoting *Aragon*, 357 P.2d at 253). Ms. Timothy has provided no evidence indicating that she could not have obtained her medical records containing the identity of the product manufacturer had she sought them. Therefore, a reasonable jury could not find that this information was unavailable to Ms. Timothy through due diligence beginning on the day of her implantation surgery, June 30, 2009. *See id.* at 796 ("It seems clear that in a normal case a reasonable jury could not find that it would take over two years to determine the manufacturer of a trademarked medical device when the party knows the correct name of that device."); *see also Pratt*, 2013 WL 6146075, at *3 ("It is well established that plaintiffs cannot simply wait for information regarding a potential defendant to come to them. Rather, a plaintiff has a duty to act with reasonable diligence to ascertain the identity of a defendant." (internal citations and quotation marks omitted)).

Finally, Ms. Timothy discovered that the product had a possible causal relation to her injury by April 19, 2010, when she saw Dr. Johnson about her pelvic pain and vaginal bleeding. During this visit, Dr. Johnson told her that he could "feel the mesh" and that the mesh "was causing the bleeding." (Sharrene Timothy Dep. [Docket 39-2], at 165:18–21). He told Ms. Timothy that he could "fix" the mesh with an outpatient surgery. (*Id.* at 165:25). At this point, Ms. Timothy knew that the mesh had a "possible causal relation" to her symptoms of pain and bleeding, *see Hansen*, 2011 WL 6100848, at *3, and the final prong of *Aragon* was satisfied,

thereby triggering the UPLA's statute of limitations. Accordingly, the statute of limitations, having expired on April 19, 2012, bars her claim which was not filed until September 26, 2012.

The plaintiffs' arguments do not change this definitive outcome. First, in an attempt to create an issue of material fact, the plaintiffs point to Ms. Timothy's Plaintiff Fact Sheet, wherein she explains that she did not "attribute" her pain to the mesh until seeing a television commercial in 2011. (Resp. [Docket 73], at 6). However, when the plaintiff conclusively attributed her injury to the product is not the relevant question. *See Hansen*, 2011 WL 6100848, at *3 ("[A] plaintiff need not have a 'confirmed diagnosis' about the causal relation to trigger the running of the statute of limitation."). Rather, the court must ask when the plaintiff had "inquiry notice" of a possible causal relation between the product and her injury. *Id.*; *see also Macris v. Sculptured Software, Inc.*, 24 P.3d 984, 990 (Utah 2001) (considering the statute of limitations for conversion and concluding that "all that is required to trigger [it] is sufficient information to put plaintiffs on notice to make further inquiry if they harbor doubts or questions"). And the undisputed facts demonstrate that Ms. Timothy had inquiry notice on April 19, 2010, when Dr. Johnson told her that the mesh was causing her problems and needed to be "fixed" with another surgery. (*See* Sharrene Timothy Dep. [Docket 39-2], at 165:2–25; *see also, e.g.*, *McCollin v. Synthes Inc.*, 50 F. Supp. 2d 1119, 1123 (D. Utah 1999) (finding that the statute of limitations began to run when the plaintiff learned that a second surgery was needed to "replace implants")).

The plaintiffs next contend that the statute of limitations could not have begun at this time because Dr. Johnson told Ms. Timothy that the removal surgery was successful. The success of the removal surgery, however, does not change the fact that Ms. Timothy had previously discovered all that the UPLA requires to trigger the statute of limitations. *See, e.g.*, *Cannon v. Minn. Min. & Mfg. Co.*, No. 2:08-cv-532 CW, 2009 350561, at *6 (D. Utah Feb. 11,

2009) ("Under Utah law, plaintiffs are not required to receive definitive confirmation of the cause of their harms to be on reasonable notice."). *McCollin v. Synthes* is illustrative of this point. In *McCollin*, the plaintiff had bone grafts, plates, and screws implanted into his spine on April 24, 1991. 50 F. Supp. 2d at 1121. The surgery did not result in proper fusion of the bones, and six months later, the plaintiff had a second operation, which was successful. *Id.* Two years after the second operation, the plaintiff saw a television program about the improper use of spinal implants, and he filed suit against the manufacturers in 1995. *Id.* The manufacturers moved for summary judgment under UPLA's statute of limitations. *Id.* at 1222. In dismissing the case, the court relied on the plaintiff's testimony that his surgeon explained to him that "the need for the second surgery was caused by the fact that the hardware was not holding the bone where it needed to be . . . for the graft to grow." *Id.* at 1223 (internal quotation marks omitted). From this, the court held that the plaintiff "'discovered, or in the exercise of due diligence should have discovered, both the harm and its cause' by the time he underwent the second surgery." *Id.* (quoting § 78B-6-706). The success of the second surgery had no bearing on the court's analysis. *Id.* at 1223–24. Similarly, in this case, the temporary success of Ms. Timothy's revision surgery does not nullify what she had already discovered from Dr. Johnson on April 19, 2010, that is, that the mesh had caused her symptoms of vaginal bleeding and pain and needed to be surgically repaired.

"It is well settled that the issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question for the [factfinder]." *In re Adoption of Baby B.*, 308 P.3d 382, 418 (Utah 2012) (citing *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir. 1985) (internal quotation marks omitted)). Where the evidence is "so clear that there is no genuine factual issue," however, the determination can be made as a matter of law. *Maughan*,

758 F.2d at 1388. The evidence in this case is clear: Ms. Timothy discovered her injuries, the identity of the product manufacturer, and a possible causal connection between the product and her injury on April 19, 2010. No reasonable jury could find otherwise. Therefore, I **FIND** that the statute of limitations for her products liability claims ran until April 19, 2012, five months before she filed suit, and as a result, her claims are barred by the UPLA's statute of limitations.

Mr. Timothy's claim for loss of consortium is dependent on the success of Ms. Timothy's claims. A loss-of-consortium claim is "derivative from the cause of action existing in behalf of the injured person[,] and may not exist in cases where the injured person would not have a cause of action." Utah Code Ann. § 30-2-11(5)(a), (b). Furthermore, "[t]he statute of limitations applicable to the injured person shall also apply to the spouse's claim of loss of consortium." *Id.* § 30-2-11(3). Therefore, I **FIND** that Mr. Timothy's claim is time barred as well.

## IV.    Conclusion

For the reasons stated above, BSC's Motion [Docket 39] is **GRANTED**, and this case is **DISMISSED with prejudice**. The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:  March 26, 2015

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

14